**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE GREEN PET SHOP ENTERPRISES, LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>COMFORT REVOLUTION,<br><br>                    Defendant. | Civil Action No. 20-2130 (GC) (TJB)<br><br>**OPINION** |

**CASTNER, District Judge**

      **THIS MATTER** comes before the Court upon Defendant Comfort Revolution, LLC's Motion for Summary Judgment under Federal Rule of Civil Procedure (Rule) 56. (ECF No. 100.) Plaintiff The Green Pet Shop Enterprises, LLC opposed. (ECF No. 104.) Defendant replied. (ECF No. 105.) The Court has carefully considered the parties' submissions as well as limited oral argument. (ECF No. 112.) For the reasons set forth below, and other good cause shown, Defendant's Motion is **GRANTED**.

## I.    BACKGROUND[1]

      On January 9, 2020, Plaintiff brought this patent infringement action against Comfort Revolution in the United States District Court for the Western District of North Carolina. (ECF

---

[1]      Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

No. 1.)[2]  Plaintiff, an Illinois-based company, manufactures and "brings to market high quality, unique, and eco-friendly pet products."  (*Id.* ¶ 2.)  Plaintiff is the "lawful owner by assignment of all rights, title and interest in and to" U.S. Patent No. 8,720,218 (the '218 Patent), which claims a pressure-activated recharging cooling platform.  (*Id.* ¶¶ 7-8.)  Defendant "makes, imports . . . [and/or] sells" the "Therapedic Cooling Gel & Memory Foam Pillow" (the Accused Product), the allegedly infringing product in this action.  (*Id.* ¶ 10.)  Defendant pursues multiple affirmative defenses, including patent invalidity and non-infringement.  (ECF No. 33 at 9-10.)  Defendant has also counterclaimed, seeking a declaration that "each and every claim" of the patent in suit is invalid under 35 U.S.C. §§ 101-103, 112, and/or 282.  (*Id.* at 12-13.)

**A.  The Patent in Suit**

The patent in suit, the '218 Patent, was filed on April 14, 2010, and issued by the United States Patent and Trademark Office (PTO) on May 13, 2014.  (ECF No. 100-1 (Def. SMF) ¶ 1; ECF No. 104-1 (Pl. SMF Resp.) ¶ 1; *see also* ECF No. 100-3 (Ex. A) at 2.)  The '218 Patent, entitled "Pressure Activated Recharging Cooling Platform," lists Gerard Prendergast as the sole inventor and Plaintiff as assignee.  (Ex. A at 2.)

The two claims at issue are Claims 15 and 16:

> 15.  A cooling platform for cooling an object, the platform comprising:
>
> a temperature regulation layer, the temperature regulation layer having an angled segment formed by a top side and a bottom side at a predefined distance, and channels, wherein the channels form sides by contacting the top side with the bottom side; and
>
> a pressure activated recharging cooling composition within the temperature regulation layer, the pressure activated recharging

---

[2]  Defendant moved to change venue to this District, as Defendant's principal place of business is in New Jersey.  (ECF No. 6 at 2.)  In February 2020, the parties stipulated to a change of venue, and the case was transferred to this Court.  (ECF Nos. 9, 10.)

cooling composition endothermically activated and endothermically deactivated upon the application and release of pressure, respectively.

16. A cooling platform for cooling an object, the platform comprising:

a temperature regulation layer, the temperature regulation layer having a plurality of angled segments, wherein angled segments within a sealed perimeter of the temperature regulation layer are formed by a top side and a bottom side at a predefined distance, and channels, wherein the channels substantially form sides by contacting the top side with the bottom side at a predefined distance lesser than the predefined distance; and

a pressure activated recharging cooling composition within the temperature regulation layer, the pressure activated recharging cooling composition endothermically activated and endothermically deactivated upon the application and release of pressure, respectively.

(Def. SMF ¶ 3; Pl. SMF Resp. ¶ 3; *see also* Ex. A, col. 7:12-38.)

The claimed cooling composition is a "class or genus" of pressure activated recharging cooling compositions, including "all compositions" that are endothermically activated and deactivated upon "the application and release of pressure, respectively." (Def. SMF ¶¶ 13-14; Pl. SMF Resp. ¶¶ 13-14.) The '218 Patent's specification discloses a single pressure-activated recharging cooling composition within the temperature regulation layer made up of 30% carboxymethyl cellulose, 20% water, 35% polyacrylamide, and at least 15% alginic acid. (Def. SMF ¶ 2; Pl. SMF Resp. ¶ 2; *see also* Ex. A, col. 3:25-28.) This single composition is the only "pressure activated recharging cooling composition" disclosed in the '218 Patent. (Def. SMF ¶¶ 2, 15; Pl. SMF Resp. ¶¶ 2, 15.)

### B. Claim Construction

On April 19, 2021, after the parties submitted briefing, the Court held a hearing under *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

(ECF No. 52.)  On November 19, 2021, the Court issued its *Markman* Opinion, construing the following disputed claim terms: (1) "temperature regulation layer," (2) "top side" and "bottom side," (3) "contacting," (4) "pressure activated," and (5) "endothermically activated" and "endothermically deactivated."  (ECF Nos. 60-61.)  The Court determined that the terms "temperature regulation layer," "top side," and "bottom side," when read in the context of the written description, are understandable to a jury and need not be construed.  (ECF No. 60 at 11-12.)  The Court construed the term "contacting" as "touching."  (*Id*. at 12-13.)  It construed the term "pressure activated" as "activated, at least in part, by pressure" and the terms "endothermically activated" and "endothermically deactivated" as "absorbs heat" and "releases heat," respectively.  (*Id*. at 13-16.)

### C.  Motion for Summary Judgment

On August 2, 2024, Defendant moved for summary judgment, arguing that Claims 15 and 16 are invalid and not infringed by the Accused Product.  Defendant asserts that the '218 Patent is invalid because (1) Prendergast is not the sole inventor of the claimed invention; (2) Claims 15 and 16 cover all compositions that cool upon the application of pressure but fail to disclose how the invention works; (3) the '218 Patent does not describe how to make or test the claimed cooling compositions; and (4) the claimed invention was offered for sale over a year before the '218 Patent was filed.  Defendant argues that the Accused Product does not infringe the '218 Patent because it does not have the claimed bottom side of a temperature regulation layer between its cooling gel and the pillow.

For the reasons set forth below, the Court grants summary judgment on the issue of inventorship.  Accordingly, it recites only those additional facts bearing on the inventorship question.

### D. Inventorship

#### 1. Undisputed Facts

Prendergast enlisted a factory in China to provide him with "a composition for use in his cooling pad that did not require freezing." (Def. SMF ¶ 7, 12; Pl. SMF Resp. ¶ 7.) The factory subsequently "created" the single pressure-activated cooling composition disclosed in the '218 Patent's specification and provided "it and its chemical formula" to Prendergast. (Def. SMF ¶ 8; Pl. SMF Resp. ¶ 8.) At the time the '218 Patent application was filed, Prendergast "did not know how to make or identify compositions, other than [the cooling composition disclosed in the specification], that could endothermically cool upon the application of pressure." (Def. SMF ¶ 9; Pl. SMF Resp. ¶ 9.) The factory's development of the "claimed cooling composition . . . was not disclosed to the [PTO]." (Def. SMF ¶ 12; Pl. SMF Resp. ¶ 12.)

#### 2. Other Relevant Testimony

Prendergast testified that he had the "germ, the seed of the idea of the cool pet pad" that was a "firm," gel composition, "taking" and "stretching" out the "concept" to seat cushions and for "people in hospitals." (ECF No. 100-8 at 15:5-6, 26:13-15, 117:1-4.) He stated that "the factories [in China] . . . came up with the formula" for the cooling pad, but the "concept of using it . . . for pets" was his. (*Id*. at 117:1-4.) Once he received the samples from the factory, Prendergast testified that he would "tweak" and "test" what the factory provided by taking the sample to another factory that he trusted to perform a chemical analysis. (*Id*. at 25:25-27:3.)

By "testing and using" the Chinese factory's samples, Prendergast stated that he discovered the pressure-activated property of the cooling composition created by the factory. (*Id*. at 27:19-28:2-9.) He testified as follows:

> Q:    Okay. So obviously you're familiar with the patent application that you're the named inventor on and the patent

for the cool pet pad, so have you heard the term before "pressure-activated cooling composition"?

A:      Yes.

Q:      Okay.  And was what this -- these factories that you worked with over in China, is what they developed, was it a pressure-activated cooling composition?

A:      Yes.

Q:      Okay.  And how did you learn -- how did you come to learn that the cooling composition was pressure activated?

A:      I would say by testing it and using it.

Q:      Okay.  Did you ever tell the factories in China that you wanted a composition that was pressure activated?

A:      No.

Q:      Okay.  So it was, I guess for lack of a better words [sic], sort of after the fact when you received the samples from the Chinese factory that you realized that they were pressure -- that it was pressure activated?

A:      Well, it was -- in our discussions about how this chemical would work, there was -- it was -- well, basically yes to your question.

                              . . .

Q:      And you had testified earlier that this chemical composition came from the factory, correct?

A:      Yes.

Q:      And it's accurate, right, that this chemical composition was not something that you asked to be provided, but it was something that was provided by the factory?

A:      They put it together.  I did ask what's inside it.

Q:      Right.  Right.  But you didn't direct them to formulate this composition, correct?

6

> A:    Correct.
>
> Q:    Okay.  And it's correct too that you didn't direct the factory to provide you a pressure-activated cooling composition?
>
> A:    Correct.
>
> Q:    Okay.  And I believe you testified earlier, you found out later, after the factory provided you the composition, that it was pressure-activated, correct?
>
> A:    Yes.

(*Id*. at 27:8-28:1, 106:22-107:17.)[3]  Dr. Nathaniel Lynd, Plaintiff's expert, testified that the pressure-activated recharging cooling composition is the "key" feature of the claimed invention. (ECF No. 100-5 at 25:4-10; 33:3-16.)

Prendergast also stated that he designed the "outer casing" for the gel pad.  (*Id*. at 28:10-29:7.)  He testified that he identified an issue with the gel, which would "squish around too much" if, for example, a person "put" their hand on the pad.  (*Id*. at 31:12-18.)  As a result, he first

---

[3]    The parties did not include Prendergast's deposition testimony in their fact statements, as either disputed or undisputed.  During oral argument, the Court questioned whether Prendergast's testimony was in dispute.  Plaintiff does not dispute Prendergast's testimony, but contends that a fact finder should evaluate his credibility.  (*See* ECF No. 112 at 8:25-9:3.)  However, Plaintiff cannot raise a genuine dispute of material fact by arguing in conclusory fashion that a jury would doubt Prendergast's credibility.  *See Yufa v. TSI, Inc.*, 652 F. App'x. 939, 948 (Fed. Cir. 2016) (holding that "conclusory assertions" related to a witness's credibility were "not sufficient to overcome a motion for summary judgment" (citing *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1158 (Fed. Cir. 2004))); *Lamont v. New Jersey*, 637 F.3d 177, 182 (3d Cir. 2011) (noting that a party opposing summary judgment "must point to evidence—whether direct or circumstantial—that creates a genuine issue of material fact, 'and may not rely simply on the assertion that a reasonable jury could discredit the opponent[s'] account.'" (alteration in original) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003))).  The Court finds that this additional testimony provides relevant context to the undisputed facts that pertain to the inventorship issue.  (Def. SMF ¶¶ 8-9; Pl. SMF Resp. ¶¶ 8-9.)

designed a "dimpled" clear, plastic cover to "inhibit" this effect and then a pad with the gel separated into "squares." (*Id*. 31:12-18, 78:20-79:5.)

## II.    <u>LEGAL STANDARD</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "[I]nferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983). That is, the court must view all facts "in the light most favorable to the nonmoving party." *Turco*, 935 F.3d at 161.

## III.    <u>DISCUSSION</u>

Defendant contends that Claims 15 and 16 are invalid under 35 U.S.C. § 102(f)[4] because Plaintiff did not invent the claimed cooling composition or temperature regulation layer. (ECF

---

[4]    For patents filed before the implementation of the America Invents Act (AIA) on March 16, 2013, § 102(f) "ma[de] the naming of the correct inventor or inventors a condition of patentability; failure to name them renders a patent invalid." *In re VerHoef*, 888 F.3d 1362, 1367-

No. 100-2 at 37-39.)  Under § 102(f), "[a] person shall be entitled to a patent unless . . . he did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f).[5]  "A patent is invalid if more or less than the true inventors are named."  *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1301 (Fed. Cir. 2002).  Because patents are presumed valid, "there follows a presumption that the named inventors on a patent are the true and only inventors."  *Id.*; *see also Caterpillar Inc. v. Sturman Indus., Inc.*, 387 F.3d 1358, 1377 (Fed. Cir. 2004) ("Patent issuance creates a presumption that the named inventors are the true and only inventors.").  To overcome that presumption, a party challenging inventorship needs to prove the misjoinder or nonjoinder of inventors by clear and convincing evidence.  *Trovan, Ltd.*, 299 F.3d at 1301.  That is, "a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise."  *Plastipak Packaging, Inc. v. Premium Waters, Inc.*, 55 F.4th 1332, 1340 (Fed. Cir. 2022) (quoting *SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006)).

"[D]etermining 'inventorship' is nothing more than determining who conceived the subject matter at issue . . . ."  *In re VerHoef*, 888 F.3d 1362, 1365 (Fed. Cir. 2018) (quoting *Sewall v. Walters*, 21 F.3d 411, 415 (Fed. Cir. 1994)); *see also Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) ("Conception is the touchstone of invention . . . .").  Conception, and by extension, inventorship, is "ultimately a question of law . . . premised on underlying facts."  *Id.*; *BearBox LLC v. Lancium LLC*, 125 F.4th 1101, 1118 (Fed. Cir. 2025) ("The

---

68 (Fed. Cir. 2018).  Because the '218 Patent was filed before March 16, 2013—on April 14, 2010, it is governed by the pre-AIA § 102(f).

[5]      The pre-AIA § 102(f) is available at https://www.uspto.gov/web/offices/pac/mpep/mpep-9015-appx-l.html#d0e302383 (last visited Feb. 14, 2025).

conception inquiry is fact-intensive. . . . [b]ut [c]onception is a legal conclusion premised on various underlying facts." (internal quotation marks and citations omitted)).

"Conception," for purposes of inventorship, is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986) (internal quotation marks omitted); *see also Preston v. Marathon Oil Co.*, 584 F.3d 1276, 1287 n.6 (Fed. Cir. 2012) (same); *In re Stirling*, 47 F.2d 809, 810 (C.C.P.A. 1931) ("The word 'invention,' as used in the statute, implies that the product thereof, or the method or process by which the product is created, must be the result of a preformed idea embracing the article, or the method, as a definite conception of the mind."). An idea is "definite" when "only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Burroughs Wellcome Co.*, 40 F.3d at 1228. That is, "when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue." *Id.*

"Conception must include every feature or limitation of the claimed invention." *Kridl v. McCormick*, 105 F.3d 1446, 1449 (Fed. Cir. 1997); *REG Synthetic Fuels, LLC v. Neste Oil Oyj*, 841 F.3d 954, 962 (Fed. Cir. 2016) (same); *Hitzeman v. Rutter*, 243 F.3d 1345, 1354 (Fed. Cir. 2001) ("In establishing conception, a party must show possession of every feature recited in the count, and that every limitation of the count must have been known to the inventor at the time of the alleged conception." (internal quotation marks omitted)). "[A]n inventor who failed to appreciate the claimed inventive features of a device at the time of alleged conception cannot use his later recognition of those features to retroactively cure his imperfect conception." *Hitzeman*, 243 F.3d at 1358-59. As a "rare" exception to this rule, "commonplace properties of a claimed

invention may be deemed 'inherent' to the invention," such that "specific conception of these properties is not required." *Id*. at 1354. In this special circumstance, the inventor must show that "the allegedly inherent property adds nothing" to the claimed invention "beyond the other recited limitations" and is "redundant to the count." *Id*. at 1355.

More than one inventor can conceive the subject matter of a claimed invention. *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). Joint inventors need not make equal contributions to the invention or contribute to every claim of the patent to be considered as such. *Id*. To be a joint inventor, one must:

> (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art.

*Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998). However, "one does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention." *Ethicon, Inc.*, 135 F.3d at 1460. That is, an inventor "may use the services, ideas and aid of others in the process of perfecting his invention without losing his right to a patent." *Id*. (quoting *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985)). Furthermore, "one of ordinary skill in the art who simply reduced the inventor's idea to practice is not necessarily a joint inventor, even if the specification discloses that embodiment to satisfy the best mode requirement." *Ethicon, Inc.*, 135 F.3d at 1460; *Tavory v. NTP, Inc.*, 297 F. App'x 976, 979 (Fed. Cir. 2008) ("Simply reducing to practice that which has been conceived by others is insufficient for co-inventorship."). The "critical question" of inventorship is "who conceived . . . the subject matter of the claims at issue." *Pannu*, 155 F.3d at 1351.

"[An] inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure." *Id*.; *see also ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607, 611 (Fed. Cir. 2019) ("[R]eliable corroborating evidence preferably comes in the form of records made contemporaneously with the inventive process." (internal quotation marks omitted)). An inventor's testimony, "standing alone," cannot "rise to the level of clear and convincing proof." *Ethicon, Inc.*, 135 F.3d at 1461. "The rule is the same for an alleged co-inventor's testimony." *Id*.; *see also Trovan, Ltd.*, 299 F.3d at 1301 ("To meet the clear and convincing burden of proof, alleged co-inventors must prove their contribution to the conception with more than their own testimony respecting the facts surrounding a claim of derivation or priority of invention."). Indeed, "[c]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent." *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1159 (Fed. Cir. 2004). "This requirement stems from the suspect nature of oral testimony concerning invalidating events." *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 628 F.3d 1359, 1374 (Fed. Cir. 2010). Corroborating evidence can take "many forms," including "contemporaneous documents prepared by a putative inventor" or "oral testimony of someone other than the alleged inventor." *Id*. "Whether the inventor's testimony has been sufficiently corroborated is evaluated under a 'rule of reason' analysis," requiring "an evaluation of all pertinent evidence . . . so that a sound determination of the credibility of the alleged inventor's story may be reached." *Id*. (quoting *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993)).

Here, the '218 Patent, issued by the PTO in May 2014, is presumed valid, as is Prendergast's inventorship. To overcome that presumption, which is Defendant's burden, Defendant must prove by clear and convincing evidence that Prendergast was not the sole inventor of the subject matter in Claims 15 and 16. Defendant rests their invalidity claim solely on

Prendergast's testimony, offering no documentation or additional testimony to corroborate it. Specifically, Defendant uses Prendergast's testimony to challenge the inventorship of two aspects of the claims at issue: (1) the pressure-activated recharging cooling composition and (2) the temperature regulation layer. The Court's inventorship analysis begins and ends with the pressure-activated recharging cooling composition. For the foregoing reasons, the Court finds that Defendant has met its burden to prove by clear and convincing evidence that Prendergast is not the sole inventor of the claimed cooling composition, such that "no reasonable jury could find otherwise." *See Plastipak Packaging, Inc.*, 55 F.4th at 1340.

As stated above, inventorship is a question of law premised on underlying facts. The Court concludes that the facts necessary for it to determine inventorship as a matter of law are not in dispute. The parties do not dispute that the '218 Patent claims "[a] cooling platform for cooling an object, the platform comprising . . . a pressure activated recharging cooling composition within the temperature regulation layer" that is "endothermically activated and . . . deactivated upon the application and release of pressure, respectively." (Def. SMF ¶ 3; Pl. SMF Resp. ¶ 3; *see also* Ex. A, col. 7:12-38.) The parties agree that the claimed cooling composition is a "class or genus" of pressure activated recharging cooling compositions, including "all compositions" that are endothermically activated and deactivated in the way defined by Claims 15 and 16. (Def. SMF ¶¶ 13-14; Pl. SMF Resp. ¶¶ 13-14.) The parties do not dispute that the '218 Patent's specification discloses a pressure activated recharging cooling composition, made up of "30% carboxymethyl cellulose, 20% water, 35% polyacrylamide, and at least 15% alginic acid" and that this single composition is the only "pressure activated recharging cooling composition" disclosed in the '218 Patent. (Def. SMF ¶¶ 2, 15; Pl. SMF Resp. ¶¶ 2, 15.)

Additionally, the parties do not dispute the following facts arising from Prendergast's testimony regarding the disclosed cooling composition: (1) this cooling composition was "developed by a factory" after Prendergast "requested that a factory provide a composition for use in his cooling pad that did not require freezing"; (2) this factory "created" the disclosed cooling composition "and provided it and its chemical formula to Mr. Prendergast"; (3), at the time that he filed the '218 Patent application, Prendergast "did not know how to make or identify compositions, other than [the cooling composition disclosed in the specification], that could endothermically cool upon the application of pressure"; and (4) the factory's creation of the claimed cooling composition "was not disclosed to the [PTO]."  (Def. SMF ¶¶ 7-9, 12; Pl. SMF Resp. ¶¶ 7-9, 12.)

Defendant argues that, because it is undisputed that Prendergast did not invent the pressure activated recharging cooling composition disclosed in the '218 Patent, he did not solely invent the claimed invention.  While Defendant acknowledges in its briefing that Prendergast claims that he "discovered" the pressure-activated nature of the cooling composition developed by the factory, Defendant argues that Prendergast's discovery of this property is "irrelevant" and does not render it "patentably new" to him.  (ECF No. 100-2 at 38.)  Prendergast testified that, after receiving the sample cooling pad from the Chinese factory, he discovered its pressure-activated property by "testing and using it."  (ECF No. 100-8 at 27:19-28:2-9.)  Prendergast stated that he did not direct the factory to provide a pressure-activated cooling composition or inform the factory that he wanted such a feature.  (*Id*. at 27:23-28:1, 107:9-17.)  He admitted that the factory "developed . . . the pressure-activated cooling composition."  (*Id*. at 27:14-18.)

Plaintiff responds that other testimony offered by Prendergast, most of which it does not specifically assert in response to Defendant's Statement of Undisputed Material Facts, "proves that he meets the standard for inventorship," including, for example, that Prendergast had the

"germ, the seed of the idea of the cool pet pad" that was a firm, gel composition, that he "tested and tweaked" the cooling composition provided by the Chinese factory, and that he "identified a problem of the gel squishing away from where the pressure was applied" and suggested design solutions.  (ECF No. 104 at 1, 8.)

The Court disagrees that this testimony shows Prendergast's conception of the pressure-activated nature of the cooling composition.  To the contrary, Prendergast's unequivocal and undisputed testimony on the conception of the pressure-activated feature of the claimed cooling composition proves, by clear and convincing evidence, that he is not the sole inventor of the '218 Patent.  The '218 Patent undisputedly claims a class of *pressure activated* recharging cooling compositions.  As Prendergast testified, and as the parties agree, he asked the Chinese factory to provide a cooling composition for his pet pad that did not require freezing.  What Prendergast admittedly did not direct the Chinese factory to create was a pad that cooled upon the application of pressure.  He did not inform the factory that he even wanted such a feature.  (ECF No. 100-8 at 27:23-28:1.)  According to Prendergast, the Chinese factory provided him with a sample cooling composition that cooled upon the application of pressure.  But Prendergast's "discovery" of this previously unknown pressure-activation feature of the Chinese factory's cooling composition does not retroactively confer upon him conception of this feature for purposes of inventorship.  *See Hitzeman*, 243 F.3d at 1358-59.  Prendergast's *sole* inventorship is only valid if his conception, his preformed idea, of the gel cooling pet pad, included every feature or limitation of Claims 15 and 16.  *Kridl*, 105 F.3d at 1449; *In re Stirling*, 47 F.2d at 810.  It is clear from Prendergast's own testimony that he did not conceive what Plaintiff's own expert, Dr. Nathaniel Lynd, called the "key" feature of the claimed invention—the pressure-activated recharging cooling composition. (ECF No. 100-5 at 25:4-10; 33:3-16.)

While it is true that the only evidence of invalidity in this context is Prendergast's deposition testimony, the Court concludes that Prendergast's sworn statements on their own prove by clear and convincing evidence that he did not solely invent the claimed subject matter. *See In re VerHoef*, 888 F.3d at 1368 ("This case presents the 'rare situation,' or at least an uncommon one, where the [patent] application and [the applicant's] affidavit make clear that he did not himself solely invent the subject matter sought to be patented.").

The Federal Circuit's opinion in *In re VerHoef* is instructive here.  In that case, Jeff VerHoef, the claimed inventor and patent applicant, appealed the decision of the PTO, which had affirmed the patent examiner's rejection of all claims of VerHoef's pending application for a dog mobility device under § 102(f).  *Id*. at 1363.  The Federal Circuit affirmed the PTO, finding that it had correctly concluded that VerHoef did not solely invent the claimed subject matter of the patent application "on which he claimed sole inventorship." *Id*.  The Federal Circuit, in reaching that conclusion, relied on an affidavit submitted by VerHoef to the patent examiner "describing the origins and conception of the claimed invention." *Id*.  As set forth in his affidavit, VerHoef's dog had difficulty walking after surgery, and he met with a veterinarian, Dr. Alycia Lamb, for rehabilitative therapy for his dog. *Id*. at 1364.  After a couple of different approaches failed to fix the problem, VerHoef stated that he constructed a homemade harness but recognized that it would be more effective if it connected to the dog's toes. *Id*.  According to his affidavit, VerHoef discussed this issue with Lamb, who "suggested that a strap configured in a figure '8' that fit around the toes and wrapped around the lower part of the leg, above the paw, might be something to consider." *Id*. (internal quotation marks omitted).  VerHoef then filed a patent application for a dog mobility device claiming Lamb's figure eight configuration. *Id*. at 1364-1365.  The Federal Circuit reasoned that, based on VerHoef's affidavit, he did not dispute that "Lamb, not he,

contributed the idea of the figure eight loop" and that the figure eight loop is an essential feature of the claimed invention. *Id*. at 1366. Accordingly, the court held that Lamb "shared in the conception of the claimed invention" and was, thus, a joint inventor with VerHoef. *Id*. at 1366-1367. The Federal Circuit also concluded that it was appropriate to rely on VerHoef's affidavit alone in deciding inventorship because his affidavit "conclusively establish[ed] that Lamb, not VerHoef, contributed the idea of the claimed figure eight loop." *Id*. at 1367.

Like *In re VerHoef*, the Court finds that it is undisputed that Prendergast did not conceive of the pressure-activated feature of the claimed invention. (ECF No. 100-8 at 27:8-28:1, 106:22-107:17; *see also* Def. SMF ¶¶ 7-9, 12; Pl. SMF Resp. ¶¶ 7-9, 12.) Furthermore, it is not disputed that the pressure-activated cooling composition is the essential feature of the claimed invention. (ECF No. 100-5 at 25:4-10; 33:3-16.) Indeed, unlike the typical inventorship case, the analysis here does not require the Court to weigh the testimony of an alleged co-inventor, which would require corroboration. *Ethicon, Inc*., 135 F.3d at 1461. Nor does it require the Court to weigh Prendergast's own testimony in favor of inventorship. Defendant, instead, points to Prendergast's testimony to disprove his conception of the claimed subject matter. Prendergast testified that he did not create or preform in his mind the pressure-activated recharging cooling composition. These undisputed admissions, on their own, demonstrate by clear and convincing evidence that Prendergast is not the claimed invention's sole inventor. *In re VerHoef*, 888 F.3d at 1368. Even viewing these facts in the light most favorable to Plaintiff, the Court concludes that no reasonable jury could find otherwise. Because Prendergast did not conceive of the pressure-activated feature of Claims 15 and 16 of the '218 Patent, the '218 Patent is invalid as matter of law.

## IV.    CONCLUSION

For the reasons set forth above, and other good cause shown, Defendant's Motion for Summary Judgment, (ECF No. 100), is **GRANTED**.

An appropriate Order follows.

Dated: March 17, 2025

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE